[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED JUNE 20, 1996
This is the fourth decision I have written concerning disputes that have arisen as a result of suits brought by the plaintiffs against the defendant Advest Inc. On July 15, 1994, I denied the Levine I plaintiffs' motion to compel arbitration and stay court proceedings except as to one transaction which occurred on September 23, 1987. [12 CONN. L. RPTR. No 7, 240 (September 12, 1994).] The plaintiffs did not request reargument CT Page 4972 on this decision or appeal the court's order of July 15, 1994 but instituted a second action, the one now before the court, by a complaint dated September 8, 1994.
Advest filed a motion to dismiss Levine II based on the prior pending action doctrine and theories of waiver and estoppel. On July 18, 1995 I denied that motion and had every expectation that orders would soon be entered directing the parties to proceed to arbitration. [14 CONN. L. RPTR. No. 16, 507 (September 4, 1995).]
However, Advest then filed a motion for leave to file a motion for summary judgment. In that motion Advest brought to my attention the New York Court of Appeals case of Smith, Barney,Harris Uphan Co. v. Luckie, 647 N.E.2d 1308 (1995). That case was of particular relevance because it analyzed the implications of a New York choice of law clause in an arbitration agreement that read exactly like the choice of law agreement in the arbitration agreement between the parties now before the court. The Luckie court interpreted two sections in McKinney's consolidated Laws of New York Vol. 7B. "Civil Practice Law and Rules — § 7503, § 7502(b). Section 7503 is analogous to our § 52-410 and the Luckie court held that a party in a § 7503 action may interpose a statute of limitations defense and if it does so the court will decide the defense to determine if it bars the relief sought by § 7503, id. page 1313. This is a departure from the general rule that seems to say that courts decide whether a claim to enforce arbitration is timely while the timeliness of the underlying claim should be decided by the arbitrator, Avant Petroleum, Inc. Section Arabian, Inc.,696 F. Sup. 42 (S.D.N.Y., 1988), "Enforcement of Arbitration" 29 C.O.A. 231, 298 (Sec. 22), but see Rinker Portland Cement Co. v.Seidel, 414 So.2d 629 (Fla., 1982). The Luckie court held that the parties' choice that New York law would govern their arbitration agreement and its enforcement (to use the language of that agreement and the one now before the court) indicates the intention of the parties to arbitrate to the extent allowed by New York law even if application of state law would relieve the parties of their responsibility under the contract to arbitrate, 647 N.E.2d at page 1313. In light of Volt Information SciencesLtd. v. Board of Trustees, 489 U.S. 468 (1989), and despite the recent Supreme Court holding in Mastrobuono v. Shearson LehmanHutton, 514 U.S. 52 131 L.Ed.2d 76 (1995), I held in an opinion dated January 19, 1996 that federal arbitration law did not preclude the result reached in Luckie and that therefore, as in New York, a statute of limitations defense interposed in a § CT Page 497352-410 action must be decided by the court given the language of the contract to arbitrate in this case. [16 CONN. L. RPTR. No. 5, 147 (April 1, 1996).]
I permitted Advest to file a motion for summary judgment raising the defense of the statute of limitations which it did. The plaintiffs have also filed a motion for summary judgment. All of the plaintiffs ask the court to reconsider its ruling on Advest's motion for leave to file a motion for summary judgment. Many of the plaintiffs' arguments repeat arguments earlier made and I am not persuaded that my decision in this difficult area should be changed. The decision in Volt has generated volumes of controversy in the case law and in the law reviews. I am not even convinced at this point that the dissent was not correct in its prediction that some of the implications of the majority opinion in Volt created dangers for a Federal arbitration policy. TheLuckie case may be a good example of that but Volt is the law and in my opinion Mastrobuono did not cut back enough on its reach to save the plaintiffs' argument in this case.
The plaintiffs have brought the case of Gambar Enterprises v.Kelly Services, Inc., 418 N.Y.S.2d 818 (1979), to my attention but it is not persuasive. The arbitration agreement in Gambar did not contain the language that the Luckie court regarded as critical to its decision that the courts, under the agreement before the Luckie court, should decide the statute of limitation question. At 647 N.E.2d page 1313 the Luckie court said: "Undeniably in the absence of an explicit choice of law provision governing Federal law would have precluded the courts in the appeals before us from addressing the Statute of Limitations issue . . . or from issuing stays under our arbitration act . . . However, the parties' choice that New York law would govern `the agreement and its enforcement' (emphasis added) indicates their intention to arbitrate to the extent allowed by (this State's law) . . ." In any event Luckie is the highest court of the state of New York, Gambar is a lower court opinion decided some sixteen years before Luckie. As I said in an earlier memorandum I feel constrained to adopt the decision of a sister state as to the meaning of this contract language in light of the choice of law clause. Volt permits this, Mastrobuono in my opinion doesn't prevent such a result and no egregious violation of local public policy would prevent a Connecticut court from following Luckie
and its procedural implications.[1]
The court will now address the defendant Advest's motion for CT Page 4974 partial summary judgment.
(1)
In light of the court's ruling that Advest should be permitted to file its motion and Advest having filed its motion for summary judgment the first question to be decided is what statute of limitations should apply — that of this or other states, the two other candidates being New York and Florida.
Sun Oil Co. v. Wortman, 486 U.S. 717, 722 (1987), said:
 This Court has long and repeatedly held that the constitution does not bar application of the forum State's statute of limitations to claims that in their substance are and must be governed by the law of a different state.
The court held in effect that statute of limitations "may be considered procedural for purposes of the Full Faith and Credit Clause." Id. p. 723.
Language in the Connecticut cases would seem to suggest that the Connecticut statute of limitations should apply here.
 Under the general rule applicable in the usual case . . . statutes of limitation relate to the remedy as distinguished from the right, Morris Plan Industrial Bank v. Richards, 131 Conn. 671, 673 (1945).
 It is undisputed that, as a principle of universal application, remedies and modes of procedure depend upon the lex fori, Thomas Iron Co. v. Ensign-Bickford Co., 131 Conn. 665, 668 (1945).
These cases were quoted from and followed recently in Baxterv. Sturm Ruger Co., 230 Conn. 335, 339 (1994).
In a brief filed February 16, 1996 the plaintiffs make the following point: "The defendant concedes that because the statutes of limitations at issue here are procedural, rather than substantive, this Court applies Connecticut statutes of limitation despite the New York choice of law clause. This point having been made it would be completely anomalous to then maintain that the procedural rules controlling the manner in CT Page 4975 which the statutes of limitations are decided are governed by New York law because of the New York choice of law clause. As such, the plaintiffs urge the court to reconsider and correct its earlier ruling that it must follow New York C.P.L.R.; § 7502."
The plaintiffs fail to recognize, however, that there are two parts to the issue raised by the statute of limitations question in this case.
One question is what entity — court or arbitrator — is to decide the limitations claim. The other question is, whatever tribunal the limitations claim is before, to what state statutory law does it turn to resolve the limitations claim.
In other words after Volt I know of no floating federal common law that dictates that arbitrators and not courts in the first instance must decide limitations questions. The parties to an arbitration agreement can define the terms and conditions under which there shall be arbitration. The parties could have used explicit language here to the effect that limitation claims must be decided in the first instance by the courts. Luckie has decided that by using a New York choice of law clause in their arbitration agreement the parties have contracted for that very result. That is, any anomaly has been removed by the contractual agreement that according to Luckie dictates that in accordance with the New York procedural law referenced in the contract and particularly the way it is referenced, the court shall decide limitations questions. What state limitations statute to be applied is a separate question to be decided by the law of the forum — i.e. state procedure. Nothing in all that in my opinion offends Volt or Mastrobuono or should offend any interest of the state of Connecticut. As to the latter concern the court inThomas Iron Co. v. Ensign-Bickford Co., 131 Conn. at page 669 said: "if the limitation is so interwoven with . . . the cause of action as to become one of the congeries of elements necessary to establish the right, the limitation goes with the cause of action wherever brought." Luckie has determined that the parties have agreed by choice of law language that the courts not arbitrators shall decide that issue. For the purposes of the contractural understanding between the parties that matter is not procedural in the sense that it can be ignored by a Connecticut court in enforcing the contract as to arbitrators. A state court generally speaking may not be obligated to follow procedural rules of a sister state but it has the obligation to determine the CT Page 4976 contractural rights of parties to arbitration contracts. If asLuckie says the New York choice of law clause and the way it was referenced in the case before it as it was here means that under this contract the court not arbitrators decide limitations issues, then the parties' contract supplants the ordinary procedural law that would apply. If, as I have held, there is no federal bar to such an agreement what possible state bar could there be to the enforcement of such an agreement.
I will apply Connecticut's statute of limitations; it is preferable to have one statute of limitations apply and Levine I and Levine II were both brought in Connecticut courts. The plaintiffs, although never conceding the court's right to hear the issue, agree that the Connecticut Statute of Limitations applies to the plaintiffs' claims (page 11 of January 31, 1996 brief).
(2)
The plaintiffs have asserted claims of breach of contract, breach of fiduciary duty, fraudulent misrepresentation and fraudulent nondisclosure of material facts. For breach of contract the Connecticut Statute of limitations is six years, § 52-576 of the general statutes.
Breach of fiduciary duty, fraudulent misrepresentation and fraudulent nondisclosure of material facts are torts; there is a three-year statute of limitations for torts, § 52-577 of the general statutes.
I will find that in Levine I process was delivered to the sheriff on September 21, 1993. Pursuant to § 52-593a of the General Statutes that is the date of the commencement of the suit. The plaintiffs commenced Levine II on September 8, 1994.
A preliminary question that must be determined is the operative date for purposes of determining whether plaintiffs' claims are timely. The two dates would be September 21, 1993 the date Levine I was commenced or September 8, 1994 the date Levine II was commenced. Since this case in many respects is sui generis I doubt whether an issue like this has ever been raised let alone decided before. The plaintiffs do not even address the matter in their briefs and the defendant alludes to it in a footnote on page 10 of its March 4, 1996 brief. The defendant argues the Levine II complaint, which is the subject of the present motion, CT Page 4977 cannot be found to relate back — the plaintiffs argued Levine I and II were distinctly different in opposing Advest's motion to dismiss. Advest also refers to the court's opinion on the motion to dismiss (the price of writing too much) where the court according to Advest "expressly held that Levine II could not be dismissed under the `prior pending action doctrine' because the pleadings on their face were not alike and the remedies were different," 14 CONN. L. RPTR. 507, 509 (1995). But the court merely noted "on their face the two pleadings are not alike." I went on to say that: "In a factual and historical sense, the underlying basis for both suits are activities by the defendant which the plaintiffs claim wrongfully caused them loss. It is also true that Levine I seeks recovery for that loss and Levine II has a similar end in that it requests the court refer the dispute to arbitration where the same claims as are made in Levine I will be addressed." The real basis for my ruling denying application of the prior pending action doctrine to dismiss Levine II was the fact that Levine I for the reasons stated could no longer be used as a vehicle to secure arbitration. Therefore, I did not feel it would be appropriate to rely on the prior pending action doctrine because "the system as such has a preference for arbitration and where application of the doctrine effectively forecloses its use then the doctrine should not abate an action that in effect seeks arbitration."
Here, too, I believe the strong federal and state policies favoring arbitration must be taken into account. I held that the filing of Levine I by the plaintiffs could not be considered to be a waiver of the right to arbitrate and accepted the claim that its filing was in large part based on a desire to avoid statute of limitations claims. It was clear that despite the filing of Levine I the plaintiff always were intent on arbitration of the claims presented in that action.
Under the circumstances of this case it would be placing too high a price on a party's good faith attempt to seek arbitration of its claims to hold that for limitations purposes the operative date is the commencement of Levine II and not Levine I. The defendant itself argues Levine II cannot be said to "relate back" to Levine I. Obviously this is not a case raising classic relation back questions under Federal Rules of Procedure 15 C, (see Federal Practice and Procedure, Wright, Miller Kane, Vol. 6A, §§ 1497 et seq.) which deals with permissible amendments to complaints. But as the discussion in that area indicates the statute of limitations is a notice-driven doctrine. The defendant CT Page 4978 cannot claim that with Levine I and its ancillary motions it did not learn of all the substantive and procedural claims that were subsequently made in Levine II and are still being pressed.
Perhaps more to the point Levine II is merely a vehicle for seeking a court order compelling arbitration of claims the plaintiff has asserted in Levine I and in their statement of claim filed with the N.Y.S.E. on October 19, 1993; the defendant is well aware of this and has so characterized Levine II, see p. 15 of Advest January 31, 1996 brief. If the defendant wishes to take advantage of the New York choice of law clause in one context it cannot ignore a reasonable interpretation of New York law in another context. Nothing in § 7502(b) of the New York "Civil Practice Law and Rules" compels a party to demand a hearing on a limitations issue before a court. Why should the defendant receive an advantage as to the operative date for computation of the limitations period merely because it chose, pursuant to § 7502(b), to ask for a court determination of the limitation question? Certainly it suffers no prejudice by having the commencement date of Levine I as the operative date — by that action the defendant received all the notice the limitations statutes were mean to provide. I have already held the plaintiffs did not waive their arbitration rights by the filing of Levine II and the request for relief made in this action. Nothing in New York law that I can ascertain requires the court to hold that the commencement date of Levine II should be the operative date for limitations claims. Such a view would give too stingy an application of my earlier decision saying Levine II did not waive arbitration rights and in all likelihood is violative of state and federal policies favoring arbitration since Levine II merely represents an attempt made to secure arbitration for claims already made.
For all of these reasons I will discuss the statute of limitations claims using September 21, 1993 as the operative date. This was the date Levine I was commenced.
(3)
The plaintiffs' tort claims are for breach of fiduciary duty, fraudulent misrepresentation, and fraudulent non-disclosure of material facts. These claims are governed by § 52-577 of the General Statutes which provides for a three year statute of limitations for common law tort claims. CT Page 4979
The three counts asserting tort claims all incorporate paragraphs 1 through 43 of the first count. A reading of paragraphs 32 through 35 of that count and thus the other counts and a reading of the various tort claims of the Second, Third, and Fourth Counts make clear that the basis of these claims is the alleged failure of the defendant's agent to warn the investor of the risks of option trading. It would seem that such risk and any failure to supervise the accounts attached at the moment of any trade in the accounts. The defendant has cited In re ColonialLtd Partnership, 854 F. Sup. 64, 90 (D.Conn. 1994), for the common sense proposition that in securities fraud cases "the act or omission complained of occurs when the investor receives documents or material containing false or misleading information." I suppose in a fraud or breach of fiduciary obligation case the tort occurs at that time when there is a failure to disclose information, which failure constitutes the fraud or breach of obligation. Judge Cabranes noted there was no allegation of fraudulent concealment and pursuant to his interpretation of § 52-577 dismissed common law fraud claims which occurred over three years prior to the filing of the law suit.
Commenting on § 52-577 of the General Statutes our court has said its language "precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred," Fichera v. MineHill Corp., 207 Conn. 204, 212 (1988). Thus "Section 52-577 is an occurrence statute meaning that the time period within which a plaintiff must commence an action begins to run at the moment at act or omission complained of occurs: SMS Textile Mills, Inc. v.Brown, Jacobsen, Tillinghast, Lahan King, P. C., 32 Conn. App. 786,790-91 (1993). The period of limitations does not run from the date of the injury, Prokolkin v. General Motors Corp.,170 Conn. 289, 296 (1976)."
The uncontroverted evidence presented here is that none of the trades in the plaintiffs; accounts occurred within three years of the filing of either Levine I or Levine II. Indeed the loss or injury occurred here in October 1987 according to the plaintiffs allegations. In any event summary judgment should be granted as to the Second, Third and Fourth Counts.
(4)
As to the breach of contract claim the court will apply the CT Page 4980 Connecticut statute of limitation for contract actions, §52-576 of the General Statutes. The limitations for such an action under the statute is six years and the operative date in this case for determining whether the statute has run is September 21, 1993.
The breach of contract claim is set out in paragraph 44 of Count One of the Levine II complaint. There it is alleged that the defendant Advest permitted an improper concentration of the accounts in an investment that was not suitable and that Advest failed to supervise the plaintiff's accounts.
The relevant statutory language of § 52-576 is as follows:
 (a) No action for an account, or on any contract in writing, shall be brought but within six years from the date of the act or omission complained of.
In interpreting § 52-576 the important question is when can it be said that the "right of action accrues." Answering that question can, at least to me, be difficult because the meaning of the phrase can be different when a negligence action is discussed as opposed to a contract action. Close attention must be paid to the type of contract breach being claimed in discussing when the right of action accrues and what that term means.
The defendant argues that as to the suitability of investment claim a breach of contract action accrues "at the time the breach of contract occurs," Beckenstein v. Potter Currier, Inc.,191 Conn. 150, 156 (1983). According to the defendant the date of a trade in investments which are claimed not to have been suitable would constitute the breach. Thus the defendant differs sharply with the plaintiffs who claim that a breach of contract action accrues when actual damages have been incurred. Only a few trades occurred after September 21, 1987 so that if the defendant's position is accepted the limitations defense would drastically reduce the claim against Advest. On the other hand the plaintiffs suffered heavy losses in the market in October of 1987. Thus as a result of what they claim is unsuitable investment advice under § 52-576 in determining when the limitations period begins to run "the true test is to establish the time when the plaintiff first could have successfully maintained an action," GaylordHospital v. Massaro, 5 Conn. App. 465, 466, 467 (1985). The accrual of the cause of action depends on when there can be said CT Page 4981 to be a cause of action and that does not occur until the cause of action is "complete." In a breach of contract action "the cause of action is complete upon the occurrence of the breach, that is, when the injury has been inflicted," id. page 467. The analysis can become immediately circular, however, depending on how we define injury — does it mean the date when the actual monetary loss took place or does it mean in a case like this the date the unsuitable advice was given leading to the purchase of unsuitable investments? or does it relate to the last date on which there may have been a duty to supervise the investor's accounts?
The court will try to set forth what the general rule appears to be in this area.
In perhaps the most general treatise available in the section discussing "Contracts and Accounts" 54 C.J.S. Limitations of Actions § 131 says at pp. 173-74.
 In accordance with the general rule, the statute of limitations begins to run against a party to a contract when his (sic) cause or right of action on the contract accrues, and not from the time actual damages result . . . As a general rule, a contract action accrues when all events necessary to fix the other party's liability have occurred, that is, when the contract is breached by the other party but not before that time . . .
Also see Williston on Contracts, 3d ed, Vol. 18, § 2021A page 698: "The Statute runs from the time of the breach, although no damage occurs until later." This has been the rule for some time, see 6 Williston Contracts § 2004, at 5641 (rev. ed. 1938).
Neither does this notion in contract law seem to be an aberration of treatise writers or even lawyers and judges. At § 42a-2-275 of the "Uniform Commercial Code — sales" as to statutes of limitations in contract for sale it says:
 (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued . . .
(2) A cause of action accrues when the breach CT Page 4982 occurs, regardless of the aggrieved party's lack of knowledge of the breach . . .
The position of the New York court is also instructive but of course not binding under the choice of law clause or any other theory. New York seems representative of the general position of the courts on this issue. It is a sister state and due to the close commercial contacts between that state and ours it would be desirable even if not required that in the commercial and business area some semblance of uniformity prevailed. Reading § 203a and 213(2) of McKinney's Consolidated Laws of New York Annotated, Vol. 713 it is evident New York has a six-year statute of limitations for contract actions that runs "from the time the cause of action accrued to the time the claim is interposed."
Because of the number of Appellate Divisions in New York one can often find opinions at that level taking a variety of different positions on the same issue. There are lower appellate court opinions that support the plaintiffs' view. A representative case is Ryan Ready Mixed Concrete Corp. v. Coons,
267 N.Y.S.2d 627 (1966) (Sup.Ct.App. Div.), which at page 630 absent internal citations says the following:
 Although many cases hold that in a contract action the statute starts to run from the breach of the contract . . ., there are cases in which the breach and the accrual of the cause of action are not simultaneous. The statute commences to run from the time when the plaintiff is first enabled to bring his (sic) action . . . It is well established that allegations of a breach of contract are not sufficient to sustain a complaint in the absence of allegations of fact showing damage.
See also Brooklyn Union Gas Co. v. Interboro Surface Co., Inc.,
449 N.Y.S.2d 274, 275 (1982), Lewis v. Lewis, 299 N.Y.S.2d 755,756-17 757 (1969) (City Court of City of New York).
In Ely-Crvishank Co. v. Bank of Montreal, 615 N.E.2d 985
(1993) (Ct. of Appeals, N.Y.), New York's highest court over a vigorous dissent said with internal citations omitted:
 Generally, any Statute of Limitations begins to run when a cause of action accrues (CPLR 203(a)). In New York, a breach of contract cause of action CT Page 4983 accrues at the time of the breach . . . "The statute runs from the time of the breach though no damage occurs until later" (6 Williston, Contracts, § 2004, at 5641 (rev. ed. 1938), quoted in McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, (PLR 203.1, at 143). As this court recently observed in Kronos, Inc. v. AVX Corp. "settled law marks accrual" (for an action sounding in contract) from the contractural breach . . . since "nominal damages are always available in breach of contract actions" . . . , all of the "elements necessary to maintain a lawsuit and obtain relief in court" . . . were present at the time of the alleged breach in this case.
Also see Varnberg v. Minnick, 760 F. Sup. 315, 332 (S.D.N.Y., 1991), following New York law in reaching same result. In the case cited in Ely-Crvishank, Kronos, Inc. v. AVX Corp.,595 N.Y.S.2d 931 (1993), the Court of Appeals referred to the general rule that tort causes of action generally cannot accrue until the date on which an injury is sustained rather than the date of the defendant's wrongful act or the date the plaintiff's discovery of the injury.[2] But the Kronos court then went on to note that "Nominal damages are always available in breach of contract actions (5 Corbin, Contracts § 1001, at 29) but they are allowed in tort only when needed to protect an `important technical right' . . ." Id., p. 934. At page 935 the court went on to say: "Contract liability is `imposed by the law for the protection of a single, limited interest, that of having the promises of others performed . . . the law of torts . . . is concerned with the allocation of losses arising out of human activities' (Prosser and Keeton op. cit., at 5-6). In other words a party's rights in contract arise from the parties' promises and exist independent of any breach. Nominal damages allow vindication of those rights. In tort, however, there is no enforceable right until there is a loss. It is the incurring of damage that engenders a legally cognizable right." It is in this sense that in a tort action the court in Prokolkin v. GeneralMotors Corp., 170 Conn. 289, 296 (1996), said that the general rule is that a tort cause of action "accrues" when the harm is incurred.
This is a contract claim so that the general observations ofProkolkin v. General Motors Corporation, supra are not controlling. The court had a tort claim before it and was CT Page 4984 analyzing the limitations statute for torts, § 52-577. The court noted that the latter statute was an act or occurrence statute — the limitations period runs from the date of the tortious conduct. The court noted our statute differs from those in other states "the majority of which begin to run only `after the cause of action has accrued,'" 170 Conn. at 294-95. But the court was discussing the "accrual" of a tort cause of action and was saying that as opposed to the operation of our statute the accrual of the cause of action in negligence claims has traditionally been held to run from the date actual injury or harm was suffered, cf discussion in Kronos, Inc. v. AVXCorporation, supra referred to previously, see also Prosser Keeton On Torts, 5th ed, § 30, p. 165. The Prokolkin court was not defining "accrual" for the purposes of statutes of limitation in all types of action.
Beckenstein v. Potter Carrier, Inc., 191 Conn. 150 (1983), although perhaps not explicitly so stating, seems to accept the commonly accepted position that in contract cases the operative date for the running of the limitations period is the date of the breach not the date of actual damages. There a roof was constructed and completed prior to February 4, 1969. The claim was that the roof was improperly constructed. The roof started to leak according to one witness almost immediately after the building was erected and it continued to cause problems every time it rained. In finding that the plaintiff's claim was barred by the statute of limitations the court held, quoting from an earlier case that in a breach of contract case "the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted," id., p. 156. The court went on to note that the injury was inflicted when the defendant completed the roof. The court in effect rejected an equitable exception or defense to the traditional rule in contract cases that the limitations period runs from the date of breach not damages. The defense is a variation of the so-called "discovery rule" to the effect that a cause of action only runs from the date when a plaintiff discovers or should have discovered actual damages. In other words the breach is the "injury" for purposes of determining the "accrual" of the cause of action in contract cases not the date of damages — the breach occurred upon the completion of the improperly constructed roof in Beckenstein and the defendant would say upon the sale of the unsuitable stock here. That this is the holding of Beckenstein is made clear by its reliance on Kennedy v. Johns-Manville SalesCorp., 135 Conn. 176 (1948). There the plaintiff sued in CT Page 4985 negligence and for breach of contract. The plaintiff alleged the defendant breached its contract to insulate walls in the plaintiff's house in a workmanlike manner. The court held both claims were barred. The insulation work was done in 1935 but the plaintiff was not aware of the damage until 1945 since the conditions brought about by the improper work were concealed within the walls of the building. The court explicitly held that: "In the present case, the faulty work which is alleged to have broken the contract resulted in legal damage as soon as it was done," id. p. 180. The court in effect held that the accrual of a cause of action in a contract case in our state is determined in the same way as the accrual of a tort cause of action given the wording of our tort limitations statute, § 52-577. This would make sense or at least provide for less confusion given the fact that tort claims can be based on contractural relations or the interference with such relations.
The case of Gaylord Hospital v. Massaro, 5 Conn. App. 465
(1985), does not depart from these general propositions. At page 467 the court did say that the statute of limitations normally begins to run "when the cause or right of action is considered as having accrued. The true test is to establish the time when the plaintiff first could have successfully maintained an action." That makes sense in terms of the contract before the court. The plaintiff had delivered medical services over a period of time. The court determined that "the contract for medical services was continuing and indivisible and terminated with the patient's release from the hospital," id. p. 469. In other words there was no breach until this type of contract — for services rendered — was completely performed. Thus the court, earlier in the opinion, said:
 In an action for breach of contract, the cause of action is complete upon the occurrence of the breach, that is, when the injury is inflicted. Kennedy v. Johns-Manville Sales Corporation, 135 Conn. 176, 180 62 A.2d 771 (1948). In a contract where a defect in roof construction was discovered, a breach or injury is considered to have occurred only when the defective roof was completed. Beckenstein v. Potter Carrier, Inc., 191 Conn. 150, 158, 464 A.2d 18 (1983). Here the right of action may be said to have accrued upon the completion of services rendered to the patient, and not at the time he was admitted or during the time he was CT Page 4986 being treated.
Insofar as the breach of contract claim can be characterized as a failure by Advest to advise the plaintiffs as to the suitability of investments a breach would occur when the individual trades were made. Under the law and the cases that I have discussed as applied to this record the plaintiffs claims would be barred except for those trades which occurred on and after September 21, 1987.
But the plaintiffs are not obliged to accept the defendant's characterization of their claim.
The plaintiffs' claim or could be said to claim that the basis for the breach of contract action or an alternative basis is that Advest had a duty to supervise the plaintiffs' accounts and that duty ran at least until September 22, 1987 when there was a request that the accounts be transferred to Paine Webber. Although the argument is not explicitly made since the plaintiffs are wedded to the notion that the actual October dates of loss mark the point of accrual of the cause of action. the argument could be made that (1) the operative date for determination of the limitations period is September 21, 1987, (2) the duty to supervise ran until September 22, 1987, (3) despite the date of the individual trades the duty to supervise ran until the September 22nd date and (4) thus the statute is tolled to that date and the action has been brought within the limitations period.
Or to look at it another way the breach of failure to supervise included and ran up to the September 22, 1987 date. According to the just concluded analysis then a cause of action for breach ran up to that date, up to that date the losses in this account could have been avoided, a cause of action can be said to be accrued on September 21, 1987, suit was brought on that date so there is no limitations problems.
Such an analysis has to be based upon a "continuing course of conduct theory," as set forth in Fichera v. MineHill/Corporation, 207 Conn. 204, 208-13 (1988). There at page 209 the court said:
 To support a finding of a "continuing course of conduct" that may toll the statute of limitations there must be evidence of the breach of a duty that CT Page 4987 remained in existence after commission of the original wrong related thereto.
The court on the following page goes on to say:
 Where we have upheld a finding that a duty continued to exist after the cessation of the "act or omission" relied upon, there has been evidence of either a special relationship between the parties or some later wrongful conduct of a defendant related to the prior act.
The court cites Gambozi v. Peters, 127 Conn. 380, 385 (1940), which applies the continuing course of conduct analysis in limitations questions to negligence and contract actions. In that case a doctor was sued for malpractice and the court said:
 The Statute of Limitations begins to run when the breach of duty occurs. When the injury is complete at the time of the act, the statutory period commences to run at that time. When, however, the injurious consequences arise from a course of treatment, the statute does not begin to run until the treatment is terminated.
 Gambozi v. Peters involved a doctor-patient relationship. InFichera itself the court held that where allegations of fraud arose out of a vendor-vendee relationship "such a contractural relationship . . . does not create a fiduciary obligation that might have imposed on the defendants as perpetrators of a fraud the continuing duty to disclose their prior lack of candor to the plaintiffs," 207 Conn. at page 210.
The argument here would be to the effect that the duty of supervision Advest had regarding the plaintiffs' accounts created that type of "special relationship" which is a prerequisite for the tolling of the statute of limitations — if a label is necessary it might be described as a quasi-fiduciary or fiduciary relationship.
There are a variety of problems presented by the application of the "continuing course of conduct" rule in this particular case and perhaps generally where claims are made by investors against brokerage firms as a result of market losses. CT Page 4988
When the claim is made that an unsuitable investment took place and a brokerage firm is sued on that basis, having the statute of limitations run from the date of the trade makes sense. Market conditions at a particular time and place are ascertainable and the trade can be viewed on the date it was made in terms of all the holdings of the investor and his or her investment objectives. When the claimed breach is put in terms of a breach of a general duty to supervise accounts divorced from any particular trade, when does the breach occur? Given the fact that there are always risks in the securities markets, that relative risks of investment choices are determined by market conditions and market conditions are fluid, how can the date of final supervision be used as the operative date for statute of limitations purposes, if the actual "crash" leading to the loss occurs several weeks after that date — what if it occurred several months afterward, how about one year later? From this perspective even if there is a duty to supervise accounts it would seem to make more sense to use actual trade dates for purposes of applying the statute of limitations.
Also tolling doctrines like the "continuous course of conduct" rule are equitable devices to avoid what in particular circumstances may be harsh results brought about the application of the statute of limitations. The plaintiffs here maintain through their expert that Advest had a duty to supervise these accounts at least until September 22, 1987 — as of that date the losses that occurred in October 1987 could have still been avoided. Thus it is fair to have the statute run from the last date of required supervision of these accounts.
But how fair or equitable would that be under the circumstances of this case?
By requesting that these accounts be transferred to Paine Webber, as of the date of the request Advest was deprived of any opportunity to forestall losses in these accounts. As I concluded in an earlier opinion in this matter, it cannot be said that Advest had a continuing duty to supervise the accounts after the request to transfer and in fact any activity initiated by Advest in these accounts after such a request might have been a legally risky undertaking. There is no claim here that Advest breached any duty to the plaintiffs in transferring the accounts to Paine Webber. It would be one thing if the loss occurred while the duty to supervise was still operative. But if the loss occurred weeks after the duty to supervise terminated and the termination was CT Page 4989 brought about by the party claiming injury, why should that party be able to arbitrarily pick a date from which the statute of limitations should run?
In any event the foregoing discussion assumes there was such a special relationship between Advest and the plaintiffs sufficient to allow the tolling of the statute of limitations under "the continuing course of conduct" rule, Fichera v. MineHill Corporation, 207 Conn. at page 210. That supposition, in the interest of completeness should also be examined.
A place to start would be the allegations of the Levine I complaint; all paragraph references are to the First Count which sets forth the breach of contract claim. The complaint alleges that in 1986 Mr. Gabriel Levine "maintained accounts" for various parties at Shearson Lehman Brothers, par. 18. According to paragraph 20 "Mr. Levine developed a technique for trading in stock options designed to generate what he believed to be a steady and conservative stream of income." He even taught his technique to a cousin (par. 21).
Mr. Levine eventually met Mr. Badain, an Advest employee, through another individual who also was using the Levine technique (par. 22-25). Paragraph 26 has interesting things to say:
 26. Mr. Levine was proud of the options trading technique that he had developed, and Mr. Badain expressed to Mr. Levine his own enthusiasm for the technique and encouraged Mr. Levine in its use and promised to Mr. Levine that he could provide around the clock extensive brokerage and accounting services, such that would allow Mr. Levine to more actively utilize his technique.
As a consequence of Badain's "promised support encouragement, and enthusiasm for the use of Mr. Levine's option trading technique" Mr. Levine began to transfer his accounts from Shearson to Advest and between September 1986 and September 1987 Mr. Levine significantly increased his trading options in the plaintiffs' accounts, (par. 27, 28). Levine, as a consequence of Badain's encouragement and support, formed an investment partnership "utilizing his options trading technique" and friends, relatives and business associates invested their assets in the partnership (par. 29); similarly account funds and CT Page 4990 securities of the Yeshiva Trust and Scholarship Fund were transferred form Shearson to Advest by Mr. Levine as a further consequence of Badain's encouragement and support, (par. 30). During this time Levine continued to believe his options trading technique was a sound and conservative method of investing that posed no risks to his investment funds as long as he was permitted to operate the technique without restriction (par. 32). Par. 33 indicates Badain "encourage Mr. Levine's belief in the safety and soundness of his options trading technique" and neither he nor Advest advised Levine of the inherent risks of the technique or the limitations on Levine's ability to operate it under various circumstances. Further Badain knew or should have known of Levine's conservative investment goals (par. 34). In fact Badain advised many of the plaintiffs that investment in the Levine technique was a wise and safe investment (par. 35). As a result of Badain's encouragement the options trading activity in the plaintiffs' accounts increased dramatically; by September 1987 the combined liability exposure on stock option contracts on the plaintiffs' accounts exceeded $100 million dollars (par. 36). Badain as a result of this activity earned hundreds of thousands of dollars of commissions on Advest's behalf (par. 37).
In July 1987 Badain advised Levine that Advest could no longer provide the insurance coverage on the plaintiffs accounts Levine required so he was leaving Advest and moving to Paine Webber. Mr. Levine agreed to transfer the plaintiffs' accounts to Paine Webber (par. 38). The transfer of the accounts to Paine Webber began in October 1987 (par. 39) and shortly after, before any significant trading activity took place, the stock market dropped 769 points between October 14 and October 19, 1987.
A party moving for summary judgment or resisting a request for summary judgment must submit appropriate affidavits and documentation to support its position. To support the claim of a "special relationship" previously referred to and necessary to toll the limitations statute the plaintiffs of course cannot rely on conclusory and self-serving statements in their own complaint, cf State v. Tyson, 23 Conn. App. 28, 34 (1990), but allegations in the pleadings can be used as admissions against the party proffering the pleadings if they are contrary to a position being advanced at a particular point in the proceedings by that party,Schenck v. Pelkey, 76 Conn. 245, 248 (1978).
Interestingly no affidavits were submitted by Mr. Levine, the plaintiffs or their representatives to support or elucidate on CT Page 4991 Mr. Levine's allegations in the complaint that he acted with Mr. Badain's encouragement and support and was prompted to make investment decisions as a result of Badain's enthusiasm for Levine's trading technique.
However, the defendant has presented portions of two depositions taken of Mr. Levine in January of 1991 and August of 1990. Although there is some dispute as to how depositions may be used in summary judgment proceedings, if they contain admissions by a party I do not understand why such admissions cannot be considered by the court.
In the summary judgment context the importance of the admission would depend on whether counter affidavits or documents have been presented which would raise a genuine issue of material fact despite any admission.
In the deposition of August 7, 1990 Mr. Levine described his activities regarding these accounts as that of a chess player. He made his moves based on his own thoughts and did not use his brokers — they were simply delivery men. In the January 3, 1991 deposition Mr. Levine said Badain gave him stock market quotations twice a day — Badain did this by fax and the faxes gave Levine no other information than the quotations as far as he knew. Levine said he kept track of his position on a day to day basis. Badain was supposed to keep the records for him — "that's the reason why I turned other (sic) (over?) the account to him. He is supposed to keep my records." The following then occurred:
 Q But did Charlie Badain ever make any investment decisions for you?
A (Levine) No.
Q Always you?
A Yes.
Q You did it all yourself?
A That's right.
Mr. Levine then went on to describe briefly how his technique worked. CT Page 4992
The defendant also submitted an affidavit of Daniel McAuliffe who is the vice-president and Director of Compliance at Advest, Inc. He claims to have reviewed New Account Information and Option Suitability forms for Mr. Berman and Mr. Levine, principal actors in this matter, for purposes of Advest's obligations under New York Stock Exchange Rule 405. Mr. McAuliffe describes this as the "know your customer rule." (Query whether this is also not a requirement under Rule 721(b) which is directly concerned with opening accounts for options transactions.) In any event Mr. McAuliffe states in paragraph 9 of his affidavit that certain determinations by Advest — apparently as to the appropriateness of the opening of the accounts for the purpose of options trading — were appropriate. Mr. McAuliffe goes on to state that "Messieurs Berman and Levine were wealthy, sophisticated, and experienced investors who had complete control over the investment management of their respective accounts" (par. 9).
This is somewhat conclusory but in any event this affidavit, the complaint and the Levine Depositions are the only factual and/or conclusory representations I have before me to decide these motions for summary judgment.
On the basis of this material, and without more, there is nothing to establish that type of special relationship between Levine and Advest to warrant the application of the "continuing course of conduct" rule. In fact the evidence would require the court as a matter of law to conclude that no such relationship existed and the rule referred to in Fichera does not apply for the purpose of tolling the statute of limitations.
But the plaintiffs have submitted two affidavits from a Charles Fath who states in a January 31, 1996 affidavit that he has "over twenty-five years of experience in the securities industry and am familiar with the standards in the industry regarding supervision of customer accounts." The affidavits are offered to establish that type of continuous duty owed by Advest to Levine and the other plaintiffs because of the special relationship Advest had with Levine. As will be noted Fath maintains that under security industry norms Advest had a duty to supervise the subject accounts at least until September 22, 1987 and that duty did "not end with the purchase of an individual security but continues through the time that the customer has an outstanding risk with respect to the security," par. 9 of January 31, 1996 Fath affidavit. The plaintiffs equate this duty to supervise with the creation of the special relationship referred CT Page 4993 to in Fichera.
Mr. Fath says that in his experience broker-dealer firms such as Advest daily monitor the status of margin accounts to assure that the equity in the account is sufficient to meet governmental regulations, SRO regulations and the broker dealer's own requirements. He goes on to say the accounts at issue here were margin accounts and had open positions in naked options that would require daily monitoring to assure that a margin deficiency is not created in the account. What all of this has to do with protection of the investor is not clear. I do not understand how daily margin reviews have anything to do with the suitability of positions held within an account at any particular time and independent of market conditions and risks. The defendant's expert Mr. Lageman's February 28, 1996 affidavit addresses these points in a way that seems convincing to the court.
The real gravamen of Mr. Fath's position is that Advest had an ongoing duty to supervise these accounts because the exchanges have specific rules addressing the supervision of options transactions. He cites Section 20(D) of Article III Section 33 of the National Association of Securities Dealers Rules of Fair Practice. He notes these rules are virtually identical to Rule 722, Supplementary Material .20, also see Rule 922, Commentary .02 of the Constitution and Rules of the American Stock Exchange.
Mr. Lageman, the defendant's expert, in his affidavit points to what he believes is an inconsistency in the Fath position. He notes that Fath does not definitively deny that Advest's duty to supervise would terminate upon execution of the account transfer documents in this case on September 22, 1987 but he still says that the supervision of option accounts is an ongoing duty whether transactions are occurring or not. How this could be so before the accounts are actually transferred if there is such a general supervisory duty is not made clear or even alluded to by Mr. Fath.
In any event Mr. Lageman, referring to N.Y.S.E. Rule 722, notes that supervision responsibilities are required to be done "on a timely basis." Timeliness of supervising reviews depends on what is being reviewed. Mr. Lageman maintains that these supervisory duties refer to situations where the transactions are being recommended by the broker. Mr. Levine's account was "self directed"; he made the trades in the accounts without the CT Page 4994 solicitation and recommendation of the broker. Thus Advest was under no obligation to supervise the accounts to determine whether the transactions were qualitatively or quantitatively suitable (2/14/96 Lageman affidavit).
A review of the rules seems to support Mr. Lageman's position. For example Rule 723 entitled "Suitability" says no brokerage firm "shall recommend to a customer an opening transaction in any option contract" unless there is a determination made as to suitability. Even if we lend some weight to the conclusory assertions in the complaint that Mr. Badain generally encouraged Mr. Levine to carry on with his investment technique there does not appear to be any serious contention that Mr. Levine made decisions as to individual trades. If Rule 723 does not require a suitability review as to individual transactions when they are not recommended how does it make any sense to say such a review is required of the investor's account whether or not trades are being made?
Also if brokerage firms have a duty to supervise "self directed" accounts I cannot make much sense out of Rule 721(d) which says that within fifteen days after a customer's account has been approved for options transactions the brokerage firm must obtain from the customer a written agreement "that the account shall be handled in accordance with the Rules of the Exchange and the Rules of the Options Contract Clearing Corporation and that such customer, acting alone or in concert with others, will not violate the position or exercise limits set forth in Rules 704 (Position Limits) and 705 (Exercise Limits)."
Furthermore, if brokerage firms have a general supervisory duty in so-called self-directed accounts where the investor makes decisions as to individual accounts and this duty applies to individual trades and also requires ongoing supervision of the account whether trades are made or not, why are detailed supervisory requirements set forth in Rule 724 of the N.Y.S.E. only for so-called "discretionary accounts" — that is accounts where the broker can exercise discretionary power with respect to trading in option contracts in a customer's accounts.
In any event even assuming the self-imposed rules of the N.Y.S.E., specifically Rule 722, or industry standards generally required a review of customers' option accounts as to the matters set forth in that rule, I have difficulty translating that requirement into a finding of law that ipso facto that type of CT Page 4995 "special relationship" referred to in Fichera has been established under the facts of this case so as to permit a tolling of the statute of limitations.
In other jurisdictions the doctrine referred to in Fichera is often referred to as the continuous treatment rule because it arose first in medical malpractice cases, cf leading case ofBorgia v. City of New York, 237 N.Y.S.2d 319 (1962). In that type of case it was held that the limitations statute started to run only when treatment was over, when the particular professional relationship was concluded. This notion has been extended to other professional relationships. It has been extended to the attorney-client relationship, Seigel v. Kranis,288 N.Y.S.2d 831, 834 (1968), to malpractice cases involving accountants, Wilkin v. Dana R. Pickup Co., 347 N.Y.S.2d 122,125 (1973), cases of architectural malpractice, County of Broomev. Vincent J. Smith, Inc., 358 N.Y.S.2d 998, 1003 (1974), SchoolBoard of Seminole County v. GAF Corporation, 413 So.2d 1208, 1211
(1982), also see Natetzker v. Brocton Central School District,376 N.Y.S.2d 300, 307 (1975).
The basis of this doctrine, concentrating as it does on the special relationship between client and professional is set out in the cases. Thus in a malpractice case the doctrine is explained as follows in somewhat dramatic fashion.
 By its very nature the tolling exception to the bar of limitation rule rings out with logic, with morality, and with "common sense" as recognized in Thatcher. The doctor-patient relationship is in most instances a highly personal and close one, encompassing on the part of the patient a basic confidence and reliance upon the skills and judgment of the doctor with a reasonable expectation that such will be met by a deep sense of obligation and proper exercise by the doctor of his incomparable superior knowledge and the dedicated use of his best talents and judgment. Shaw v. Clough, 597 S.W.2d 212, 215 (Mo., 1980).
In Williams v. Elias, N.W.2d 121 (Neb. 1941), another malpractice case cited in Borgia v. City of New York, supra, the court agreed the statute did not run until treatment was concluded: "During the course of treatment plaintiff was not put to inquiry relative to the treatment accorded him," id. p. 123; CT Page 4996 the court went on to say "the doctrine . . . is conducive to that mutual confidence which is highly essential in the relation between surgeon and patient," id., p. 124, also see on this latter point DeHaan v. Winter, 241 N.W. 923, 924 (Mich, 1932).
In County of Broome v. Vincent J. Smith Inc., supra the court as noted extended the continuing duty doctrine to architectural malpractice cases and in doing so extensively discussed the basis of the doctrine at 358 N.Y.S.2d pages 1002-03:
 The considerations responsible for the application of this exception to the professions of medicine, law and accounting apply also to the profession of architecture. The architect creates and recommends plans to his client. These plans, conceived in his imagination, are proposed to the client as products of his education, experience and judgment. The client may offer suggestions to the architect, just as he might to his doctor. Lawyer or accountant, but generally the client is required to rely almost totally on the professional advice of the architect. He must have confidence in the architect and place his full trust in him. Should problems or difficulties arise during the course of construction, the client, unknowledgeable as he is in matters of building design and construction, is forced to depend almost exclusively on the advice of the architect. As observed in Borgia, supra and later in Siegel, supra, it would be unfair and unreasonable to require the client in this situation to question the tactics of the architect or to interrupt corrective efforts by the service of a summons and complaint. [4, 5] As with the doctor, lawyer, or accountant, acts of malpractice by an architect may not be readily apparent to the client. To apply the general rule that a claim for malpractice accrues upon the occasion of negligence may serve to encourage the architect to conceal his errors for sufficient time so as to allow the statute of limitations to expire. Or, as alleged in this case, the application of the general rule may inadvertently work an injustice where the architect in good faith leads the client to believe that any damage or injury was caused by a contractor or material supplier, and while in pursuit of relief from that source the client's time to proceed against the CT Page 4997 architect elapses. Fairness and justice dictate that a cause of action of this nature accrue only after the professional relationship has been terminated so as to afford the client an opportunity, unhampered by possible concealment, delay or unintended misguidance by the architect, to discover any possible acts or omissions constituting malpractice.
What the courts were concerned with in formulating this doctrine is not what we have here. Even if we hypothesize a duty to supervise, any such duty would have to be considered in terms of to whom the duty ran before, without more, that type of "special relationship" referred to in Fichera could be found, that in terms of the facts of this case, would warrant the tolling of the statute of limitations.
Here the very complaint describes Mr. Levine as an experienced investor who developed his own option trading technique and was so confident in it that he taught it to another investor. He used the technique at Shearson before transferring accounts to Advest, he requested a transfer of his accounts to Paine Webber not because of any intention to abandon his brainchild but because Mr. Badain told him Advest could no longer provide insurance coverage on his accounts and Badain said he was moving to Paine Webber. Mr. Levine himself in two depositions explicitly states that he made his own investment decisions as to a particular trades without any advice or recommendation from his brokers — he did not even use them, he was the "chess player" and they were "delivery men." Badain never made investment decisions for him. He did it all himself. Describing Badain's role Mr. Levine said: "He is supposed to keep my records," (see Exhibits G and H of defendant's 1/31/96 brief). Nothing has been presented to indicate the plaintiffs were unaware of the commissions Badain and Advest were earning as a result of trades in this account or that market conditions let alone a possible cause of action against Badain or Advest were fraudulently concealed by these parties.
There has been no evidence presented to indicate Mr. Levine's will was overborne or that he suffered from some incapacity regarding his ability to make or not make investment decisions which Badain or Advest knew or should have known about. This of course does not mean the defendant does not have the burden of proof on all aspects of the statute of limitations issue. But it seems to me the defendant has made a prima facie case that it CT Page 4998 should prevail on its motion. Under our rules the plaintiffs must submit something by way of affidavit or documentation to indicate a genuine issue of material fact has been raised to preclude the granting of the defendant's motion. I have received nothing from Mr. Levine or any representatives of the plaintiffs to support conclusory assertions in the complaint. The complaint appears to contain certain admissions as to matters critical to the statute of limitations claim. Portions of two depositions further support the notion that the doctrine of continuing duty set forth inFichera should not apply. All that has been presented to me are two affidavits by Mr. Fath that are somewhat conclusory and are not convincingly supported by my reading of the relevant rules of the New York Exchange and as indicated even if a supervisory responsibility existed I do not believe the continuing duty doctrine should be applied here looking at the relationship between the parties as a whole.
The plaintiffs cite the case of Corbo v. Les ChateauAssociates, et al., 511 N.Y.S.2d 883, 884-85 (1987), and refer to the following language in their brief:
 While the court is empowered to decide threshold issues, including statute of limitations issues (CPLR 7502(b)) . . . the scope of this power should be applied narrowly and substantive issues should be left to the arbitrator. While factual issues concerning the statute of limitations may be tried by the court (CPLR 7503(b)) . . . in the instant case these issues are intertwined with the ultimate substantive issues. Leaving these issues to the arbitrator will permit a more efficient resolution consistent with the objectives of CPLF article 75.
Frankly this decision by the Appellate Division of the Supreme Court causes me at least some confusion. The cases it cites for authority are not statutory time limitation cases, seeMatter of United Nations Dev. Corp. v. Norkin Plumbing Co.,408 N.Y.S.2d 424 (1978), Matter of Uddo, 250 N.Y.S.2d 645 (1964). Also the court in Smith Barney, Harris, Uphan Co. Inc. v.Luckie, 647 N.E.2d 1308, 1313 (1995), said:
 Clearly under New York law, statutory time limitations questions such as those presented on these two appeals — as opposed to contractural time limitations agreed upon by the parties are for the courts not the CT Page 4999 arbitrators . . . (Emphasis added by the court.)
The Luckie court cited County of Rockland v. PrimianoConstruction Co., Inc., 43 N.Y.S.2d 478, 481 (1980).
Also immediately before the language of Corbo which is quoted in the plaintiffs' brief the Corbo court itself said at 511 N.Y.S.2d page 884:
 Special term decided, and we agree, that there was insufficient evidence in the record to reach the conclusion that, as a matter of law, the petitioner failed to exercise reasonable diligence in discovering the fraud in 1981. Special Term did not abuse its discretion in this case in leaving ultimate resolution of these issues to the arbitrator. (emphasis added).
Clearly the defendant has the burden of proof on the statute of limitation issue, no citation of authority is necessary for that proposition. But that does not preclude the power of a court to rule on such an issue as a matter of law where the circumstances are appropriate.
In his ruling in district court in Levine v. Advest andBadain, Civ. No. #H88-331 (1995), Judge Daly cited the case ofDunham v. Dunham, 204 Conn. 303 (1987). There the court held that: "Whether an attorney-client relationship exists is an issue for the trier of fact and the party claiming its existence bears the burden of establishing such a relationship," id. p. 320. But that does not preclude a trial court from ruling as a matter of law, that given the evidence presented at trial or in a summary judgment procedure, such a fiduciary relationship has not been shown to exist or that such a relationship does not exist as would warrant the application of the doctrine alluded to inFichera to toll the operation of the statute of limitations.
I will deny the plaintiffs' motions for summary judgment and will grant the defendant's motion for partial summary judgment with the exception of the breach of contract claim as to any trades which occurred on September 21, 1987 or later.
Corradino, J.